IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| SHARON SURLES, b/n/f and daughter, JAYNEICE JOHNSON, et al., | ) ) ) | *Consolidated* <u>*Lead Case No.*</u> 4:01-cv-00107 |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 4:01-cv-00107 |
| GREYHOUND LINES, INC., and MOTOR COACH INDUSTRIES, INC., | ) ) ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

This diversity action raising claims of negligence and products liability arises out of the crash of a Greyhound bus on I-24 near Manchester, Tennessee. Currently pending are defendants' motions for summary judgment. [Ct. File Nos. 271, 274]. For the reasons that follow, Motor Coach Industries, Inc.'s ("MCI's") motion [Ct. File No. 274] will be granted. Greyhound Lines, Inc.'s ("Greyhound's") motion [Ct. File No. 271] will be granted in part and denied in part.

I.

*Factual Background*

The following factual allegations are considered in the light most favorable to the Plaintiff.

Greyhound Lines, Inc. ("Greyhound") is a national bus line providing transportation throughout the United States. On October 3, 2001, Ms. Surles was riding aboard a Greyhound bus traveling from Indianapolis to Atlanta. Also on the bus was Damir Igric ("the assailant"), who was traveling on a one way ticket to Orlando, Fl. The bus was being driven by Greyhound driver Garfield Sands ("Sands").

Testimony and statements concerning the assailant offer a conflicting account as to his demeanor and behavior on the bus. Sands first noticed the assailant in Indianapolis because he did not have a reboarding pass for the bus. Sands testified that this did not worry him, because it is common for passengers to lose them. On the leg of the trip in between Horse Cave, KY and Manchester, TN, the assailant approached the front of the bus three or four times and asked Sands what time it was, when the bus would stop again, and how far it was to the next stop. In one instance Sands stated that the assailant did not worry him, however, Sands also testified that he was concerned that the assailant might be a suicide bomber, or that he might try and crash the bus. Because of these concerns, Sands planned on talking to the assailant when they stopped in Manchester to see if he could detect anything wrong with the assailant. Sands also testified that he had received no complaints about the assailant from any of the other passengers.

One of those other passengers, Carla Cole, testified that she complained twice to the driver about the assailant continually waking her up during the trip. Cole also testified that she overheard the assailant call another passenger a "nigger." Lawrence Payton, an off-duty Greyhound driver riding the bus, was sitting in the front when the assailant approached and asked if Payton would share the seat. Payton said no and wrote in his accident report that after this he kept thinking that the assailant might try to crash the bus. Later, in his deposition, Payton

2

stated that his conversation with the assailant had not made him uneasy.

Carly Rinearson, another passenger on the bus, stated in her deposition that she overheard the assailant ask Sands if he could take control of the bus. When Sands said no, the assailant returned to his seat. Moments later Rinearson overheard the assailant say that he was going to crash the bus into a building. Soon after Rinearson overheard these comments the assailant attacked Sands, slashing his throat and grabbing the steering wheel. The bus swerved into the median and went airborne, landing on its right side in the westbound lanes of Interstate 24. The bus then slid off the interstate and into the grass shoulder along the westbound lanes.

After the accident occurred, a medic arriving on the scene found the Plaintiff outside of the bus. Plaintiff suffered significant injuries as a result of the accident, including a broken neck, broken back, and cracked ribs. Plaintiff is now a paraplegic.

Between October 3, 1997 and October 3, 2001, incidents in which passengers on Greyhound buses attacked the bus driver and/or grabbed the steering wheel occurred more than fifty times. Also, notably, Igric's attack occurred only 3 weeks after the terrorist attacks on September 11, 2001.

## II.

*Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. Rule 56 mandates the entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

III.

*Plaintiff's Negligence Claims*

A.

Sands' Failure to Remove the Assailant from the Bus

Tennessee common law holds that a plaintiff bringing a negligence action must prove:

4

"(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause." *Kellner v. Budget Car and Truck Rental, Inc.*, 359 F.3d 399, 403 (Tenn. 2004)(citations omitted). In Tennessee motor carriers have a heightened duty of care to their passengers. *White v. Metropolitan Gov't*, 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993). Greyhound denies that it breached that duty of care by not ejecting assailant prior to the attack, asserting that, as a matter of law, Sands had no reason to anticipate such an event. The court disagrees. There is substantial evidence that a reasonable jury might find that Sands should have put the assailant off the bus:

> (1) The assailant made several trips up and back asking questions of both the driver and the spare driver.
>
> (2) Strange behavior testified to by passengers.
>
> (3) Ms. Rinearson stated that the assailant made the comment that he "wanted to crash the bus."
>
> (4) Mr. Payton wrote in his accident report that he had been concerned that the bus might be hijacked by the assailant.
>
> (5) Mr. Sands admitted that he intended to speak with the assailant at the next stop, because he was getting concerned. He additionally stated that had he known about prior Greyhound bus attacks he would have put the assailant off the bus.

Based on all of the above, a jury might reasonably conclude that Mr. Sands knew or reasonably should have known to remove assailant from the bus. The Court is aware that Mr. Sands, in his

5

deposition, denied realizing the assailant was a safety concern. However, the court is also aware, as will be the jury, of the possible resistance of the driver to admit to any fault in the accident.

B.

Greyhound's Failure to Warn Drivers about the Prior Attacks

Plaintiff also asserts that Greyhound breached the common carrier duty of care by failing to alert their drivers of the 50+ attacks that happened in the four years prior to this accident. Each of these attacks involved a passenger either attacking the driver, attempting to grab the wheel of the bus, or both. Mr. Sands testified that if he had known about these other incidents he would have put the assailant off the bus before the attack occurred.

In light of the aforementioned requirements for a negligence claim, as well as the high standard of care applied to common carriers, a reasonable jury could conclude that Greyhound breached its duty of care by failing to inform their drivers about the other incidents.

C.

Plaintiff's Seatbelt Claim Against Greyhound

Plaintiff contends that, although the Federal Motor Vehicle Safety Standards ("FMVSS") do not require seatbelts for passengers on buses, Tennessee common law might create such a requirement. Greyhound and MCI claim that, even if such a common law theory was viable, it would be preempted by the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act").

Before turning to the question of federal preemption, the court will first consider whether

Tennessee courts might recognize a common law duty of a carrier (or manufacturer) to place passenger seatbelts on buses. Initially, it should be noted that Plaintiff has not identified a single instance where a state has recognized a common law duty of a carrier or manufacturer to place passenger seatbelts on a bus, whether it be a school bus, city bus, or interstate carrier. Such requirements have uniformly been creatures of statute.

> Under the Tennessee Products Liability Act of 1978:
>> A manufacturer or seller of products shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

Tenn. Code Ann. § 29-28-105(a). "Defective condition" means a condition of a product that renders it unsafe from normal or anticipatable handling and consumption. *Id*. at § 29-28-102(2). "Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product, because of its dangerous condition, would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition. *Id*. at § 29-28-102(8).

The Tennessee Supreme Court has held that in a products liability case the burden is on the plaintiff to establish injury as a result of an unreasonably dangerous product in one of two ways:

> Plaintiff may meet this burden either by establishing that the product was dangerous beyond that contemplated by an ordinary consumer (consumer expectation test) or by establishing that a reasonably prudent manufacturer, assumed to know the product's dangerous condition, would not have marketed the product

7

(prudent manufacturer test employing risk-benefit analysis).

*Ray v. BIC Corp.*, 925 S.W.2d 527, 533 (Tenn. 1996). Applying the consumer expectation test here, I find that consumers in Tennessee do not expect seatbelts for passengers on buses, but rather expect compliance with government safety standards. This court held in *Higgs v. General Motors*, that, as a matter of law, the consumer expectation test created no duty of automobile manufacturers to put passenger air bags in motor vehicles. *Higgs v. General Motors*, 655 F. Supp. 22, 25-26 (E.D. Tenn. 1985). Similarly, I conclude that the consumer expectations test creates no duty with respect to bus passenger seatbelts.

Under the prudent manufacturer standard, I find that no reasonable application of a risk-benefit analysis would result in a manufacturer refusing to market buses without passenger seatbelts. Much of that risk-benefit analysis was performed by the Department of Transportation when it applied a cost-benefit analysis and concluded that passenger seatbelts were unnecessary on buses. 39 Fed. Reg. 27,585, July 30, 1974. Thus, applying either the consumer expectation test or the prudent manufacturer test, I conclude that, as a matter of law, Tennessee common law does not place a duty on bus manufacturers or carriers to place seatbelts on bus passenger seats.

Even if the court were inclined to impose a common law duty to install passenger seatbelts on buses, the Plaintiff still must show that her claim is not preempted by the Safety Act and its accompanying regulations. In 1966, Congress enacted the Safety Act to reduce injuries and deaths caused by motor vehicle accidents. 49 U.S.C. § 30101. To further this purpose, Congress directed the Secretary of Transportation "to prescribe motor vehicle safety standards for motor vehicles . . . [engaged] in interstate commerce." *Id.* The Secretary in turn delegated that duty to the National Highway Traffic Safety Administration ("NHTSA"), who enacted

8

FMVSS. 49 C.F.R. § 1.50(a) (1998). In passing the Safety Act and providing for the establishment of safety standards, Congress indicated that another important goal was uniformity. S. Rep. No. 1301 (1966), *reprinted in*, 1966 U.S.C.C.A.N. 2709, 2720. "The centralized, mass production, high volume character of the motor vehicle manufacturing industry . . . requires that motor vehicle safety standards . . . be uniform throughout the country." *Id*.

Under the Safety Act,

> (1) When a motor vehicle safety standard is in effect under this chapter, a State or political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is *identical* to the standard prescribed under this chapter. However, the United States Government, a State, or a political subdivision of a State may prescribe a standard for a motor vehicle or motor vehicle equipment obtained for its own use that imposes a *higher performance requirement* than that required by the otherwise applicable standard under this chapter.
>
> (2) A State may enforce a standard that is *identical* to a standard prescribed under this chapter.

49 U.S.C. § 30103(b). The purpose of this preemption section is to achieve "uniformity of standards so that the public as well as industry will be guided by one set of criteria rather than by a multiplicity of diverse standards." H.R. Rep. No. 1776, at 17 (1966). On the other hand, the Safety Act states, "[c]ompliance with a motor vehicle safety standard prescribed under [the Act] does not exempt a person from liability at common law." 49 U.S.C. § 30103(e).

Regarding seatbelts on buses, FMVSS 208 states that buses manufactured on or after September 1, 1991 and weighing more than 10,000 pounds must meet the following requirements:

> S4.4.2.1 *First option–complete passenger protection system--*

9

> *driver only.* The vehicle shall meet the crash protection
> requirements of S5, with respect to an anthropomorphic test
> dummy in the driver's designated seating position, by means that
> require no action by vehicle occupants.
>
> S4.4.2.2 *Second option–belt system–driver only.* The vehicle shall,
> at the driver's designated seating position, have either a Type 1 or
> a Type 2 seat belt assembly that conforms to 571.209 of this part
> and S7.2 of this Standard . . . .

49 C.F.R. § 571.208; *see* § 571.209. The NHTSA proposed a standard requiring buses to include passenger seatbelts; however, based on a cost/benefit analysis, it decided not to enact such a requirement. 39 Fed. Reg. 27,585. In a 1992 letter to Motor Coach Industries, the United States Department of Transportation declared that a bill introduced in the New York state legislature, which would have required intercity buses to be equipped with seatbelts in every passenger seat, was expressly preempted by the Safety Act and FMVSS 208. (Letter from NHTSA to Littler, MCI of 8/19/92, at 1.); 49 U.S.C. § 30103(b).

Here, unlike the New York bill, Plaintiff's seatbelt claim is not expressly preempted by the Safety Act. *See* 49 U.S.C. § 30103(e). This court, therefore, must consider whether the Plaintiff's claim is impliedly preempted. *See* 49 U.S.C. § 30103(e); *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (holding that plaintiffs' common law claim that her car was negligently designed because it lacked a driver side air bag was not subject to express preemption because the language of the savings clause evidenced Congress's intent to save "some significant number of common-law liability cases"). In *Geier*, the applicable standard, FMVSS 208, required manufacturers to equip some, but not all, of their vehicles with air bags. *Id.* at 864-65. The Court found that, although FMVSS 208 did not expressly preempt a common-law tort action, it still could "preempt a state common-law

10

tort action with which it *conflicts*." *Id*. at 870 (citations omitted). The Court held that the plaintiff's "no air bag" claim did conflict with FMVSS 208, reasoning that Congress intended a gradual passive restraint phase-in, and "the rule of law for which petitioners contend[ed] would have stood 'as an obstacle to the accomplishment and execution of' that intent." *Id*. at 882 (citations omitted).

In *Sprietsma v. Mercury Marine Corp.*, the plaintiff's decedent had been killed in a boating accident, and the plaintiff claimed that the boat's motor was unreasonably dangerous because it was not protected by a propeller guard. *Sprietsma v. Mercury Marine Corp.*, 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002). The Federal Boat Safety Act of 1971 authorized the Secretary of Transportation to establish "minimum safety standards for recreational vessels," and the Secretary delegated that power to the U.S. Coast Guard. *Id*. at 57. The Coast Guard declined to require the installation of propeller guards on all recreational motor boat engines. *Id*. at 61. In considering whether the absence of a propeller guard requirement impliedly preempted a common law negligence claim for failure to install a propeller guard, the Court found that the mere decision not to regulate does not exert preemptive force. *Id*. at 69-70. Instead, the question is whether a common law claim would conflict with the agency's *reasons* for declining to regulate. *Id*. at 69-70.

Here, FMVSS 208 is silent with regard to passenger seatbelts on buses; therefore, this court must determine whether the Plaintiff's claim conflicts with NHTSA's *reasons* for declining to include such a provision. *Id*. Based on the cost/benefit studies available to NHTSA when it enacted FMVSS 208, NHTSA "expressly determined that there [was] not a safety need for safety belts or another type of occupant crash protection at [passenger] seating positions." (Letter from

NHTSA to Littler, MCI of 8/19/92, at 2.) (*citing* 39 Fed. Reg. 27,585). The Plaintiff's claim, which suggests that there *is* a safety need for passenger seatbelts, directly conflicts with NHTSA's finding. If this court were to find that Plaintiff's claim is not preempted, and a jury were to subsequently find that Greyhound breached its duty of care by failing to install passenger seatbelts, then, in effect, any bus traveling through Tennessee would be required to be equipped with passenger seatbelts. Because Greyhound operates buses traveling across many states, it would have to equip *all* of its buses with passenger seatbelts. If NHTSA had intended for all of Greyhound's buses to be equipped with passenger seatbelts, then it would have enacted such a requirement. However, since it did not, Plaintiff's claim conflicts with FMVSS 208.

Furthermore, by suggesting that Greyhound had a common law duty where the FMVSS did not impose a duty, Plaintiff's claim conflicts with Congress's goal of establishing uniform standards on which the motor vehicle industry can rely. H.R. Rep. No. 1776, at 17 (1966). Thus, because it conflicts with one of Congress's purposes in enacting the Safety Act and with NHTSA's reasoning in enacting FMVSS 208, Plaintiff's claim is preempted, and summary judgment is granted in favor of Greyhound on this claim.

VII.

*Punitive Damages*

In Tennessee punitive damages are awarded when the defendant has acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). *Hodges* also restricts awarding punitive damages to cases involving the most egregious of wrongs. *Id*. at 901. Based on the 50+ attacks on Greyhound bus drivers in the

previous four years, apparently while the buses were in motion, I find that a reasonable jury might conclude that Greyhound was reckless in not warning its drivers. Attacks on drivers of moving buses pose extreme dangers to passengers and Greyhound owed those passengers a higher duty of care. Summary judgment will be denied with respect to the claim for punitive damages against Greyhound.

VIII.

*Claims Against MCI*

Plaintiff also claims MCI is liable to her from enhanced injury because the bus was not equipped with passenger seat belts. It is uncontested that MCI complied with all industry and governmental standards in the manufacture and equipping of the bus. As pointed out above with respect to Greyhound I conclude that Tennessee common law imposes no duty on a bus manufacturer to equip a bus with passenger seat belts, and if such a duty were created at common law, it would be preempted by the Safety Act. Accordingly, MCI, like Greyhound, is entitled to summary judgment on the seatbelt claim.

To the extent that Plaintiff attempts to raise any other claim against MCI that the bus was somehow defective or unreasonably dangerous in its construction or equipment, those claims are also preempted by the Safety Act. Finally, to the extent that Plaintiff attempts to bring any negligence claims against MCI, there is no proof that MCI was aware of the alleged attacks on Greyhound bus drivers. In light of the foregoing, MCI is entitled to summary judgment.

13

## IX.

*Conclusion*

Accordingly, the motion for summary judgment of defendant MCI [Ct. File No.274] will be granted and that Defendant will be dismissed.

Greyhound's motion for summary judgment [Ct. File No. 271] will be granted in part and denied in part. With respect to the seat belt claim the motion will be granted. In all other respects the motion is denied.

The issues for trial having been significantly reduced, the court will not bifurcate the liability from damages claims against Greyhound. However, the punitive damages claim, if it should remain viable, will be bifurcated in accordance with Tennessee case law.

Order accordingly.

                                             *s/ James H. Jarvis*
                                            UNITED STATES DISTRICT JUDGE